# CHARLESTON.

EDWIN S. ALLEN, *et als.* v. L. M. LAFOLLETTE, *et als.*

Submitted June 5, 1923.　Decided June 19, 1923.

1. PUBLIC LANDS—*Sale of Undivided Interest in Land Subject to Sale for Benefit of School Fund Void.*

   A sale of an undivided interest in land under Chapter 105, Code, is void. (p. 708).

2. SAME—*To Effect Redemption of Any Part of Lands for Benefit of School Fund, Taxes on Whole Must be Paid.*

   An undivided interest in land cannot be redeemed under Chapter 105, Code, but in order to effect a redemption of any part the taxes on the whole must be paid. (p. 708).

3. SAME—TENANCY IN COMMON—*Attempted Redemption of Cotenant of Undivided Interest of Land by Paying Such Proportion of Taxes and Permitting Sale to Third Party Ineffectual, But Sale Invalid and Title Revested in All.*

   Where one cotenant in a proceeding under Chapter 105, Code, attempts to redeem an undivided interest by paying such proportion of the taxes, and permits the sale of the remainder by an arrangement with a third party to purchase for his benefit at such sale, the sale and conveyance thereunder are

void and ineffectual to pass title, but will operate, with the payment already made, to complete the redemption of the whole title and to reinvest the same in all the cotenants. (p. 711).

4. TENANCY IN COMMON—*Law Validating Sales and Conveyances for School Fund Held not Applicable. Where Cotenant Attempts Redemption of Undivided Interest.*

Section 19, Chapter 105, Code, validating sales and conveyances under said chapter, will not apply to such sale and conveyance. (p. 711).

5. EQUITY—*Laches Cannot be Set Up as Bar to Legal Title to Land.*

Laches cannot be set up as a bar to legal title to land. (p. 711).

6. TENANCY IN COMMON—*Evidence Held Insufficient to Establish Ouster of Cotenants by Adverse Possession.*

Evidence that one cotenant gave notice to the other cotenants that he was claiming their interest in the land by sale under Chapter 105, Code, and thereafter requested the tenants, holding possession under all the cotenants, to protect the property against trespass, or stated to them that the property was his, and that he desired them to protect it against trespass, but that they could occupy and cultivate the same as they had been doing; is wholly insufficient to establish an ouster by him of his cotenants for the purpose of acquiring their interest by adversary possession. (p. 712).

7. SAME—*Cotenant Claiming Real Estate by Adverse Possession Under Statute of Limitations Must Establish Ouster by Clear and Convincing Proof for Statutory Period.*

One claiming the title of his cotenants in real estate by adverse possession under the statute of limitations, must establish by clear and convincing proof an ouster of such cotenants, continued for the statutory period. (p. 713).

Appeal from Circuit Court, Boone County.

Suit by Edwin S. Allen and others against L. M. LaFollette and others. From a decree for plaintiffs, defendants other than Ira G. Sayre appeal.

*Affirmed.*

*Leftwich & Shaffer, W. E. R. Byrne, Poffenbarger, Blue & Dayton,* and *A. M. Prichard,* for appellants.

*Murphy & Wade* and *Price, Smith, Spilman & Clay,* for appellees.

LITZ, JUDGE:

A decree in chancery was entered by the circuit court of Boone County February 15th, 1922, decreeing the plaintiffs Edward S. Allen, Mary O. Silkman, Elizabeth O. Repplier, and the defendant Ira G. Sayre, to be the owners jointly of an undivided 5/144 of a tract of land situate on the waters of Joe's Branch, Boone county, West Virginia, called 1951 acres, as contenants of certain of the other defendants. This decree also set aside certain deeds under which such other defendants claim, in so far as the same affect the interest and title of plaintiffs and the defendant Ira G. Sayre; and referred the cause to a commissioner in chancery to ascertain and report the amount due by plaintiffs and defendant Sayre to their said co-tenants for taxes and other proper charges against said land, and also the amount from rents and the sale of timber and other products from the land, for which said cotenants should account to plaintiffs and defendant Sayre. From that decree the defendants, other than Ira G. Sayre, prosecute this appeal.

Plaintiffs and Sayre claim under Richard A. Oakley, who in his lifetime, with his cotenants G. S. Biby, Edward A. Biby, Edwin Van Antwerp, Henry A. Oakley, John Devereaux, Henry A. Eagle, Elizabeth O'Connor and G. T. Snow, Trustee, owned said land in fee. This land was entered, and remained, on the land books until 1880 as the property of G. S. Biby and others; but no taxes were paid by these owners after 1869.

The commissioner of school lands for Boone county filed his report April 17th, 1902, alleging the forfeiture of the land for non-entry on the land books since the year 1880, and non-payment of taxes from 1869. Immediately thereafter suit was instituted in the name of the *State* v. *W. H. Biby and others,* (the plaintiffs being named as defendants, if at all, under the appellation of "the unknown heirs of Richard A. Oakley, deceased"), to have said land sold, under Chapter 105, Code, for the benefit of the school fund. A decree was entered July 16th, 1902, referring the cause to a commissioner in chancery for the purpose, among others, of ascertaining and reporting the amount of taxes, interest and damages due and

unpaid upon the land, and in whom title was vested at the time of the forfeiture.

In the meantime the defendants, L. M. LaFollette and H. A. Robson, set about to acquire from plaintiffs and their co-tenants the entire ownership of the land; and in pursuance of this undertaking, the following deeds were secured, conveying undivided interests therein:

Deed, dated June 19th, 1902, from the executors of Henry Eagle to H. A. Robson and L. M. LaFollette for the interest of Henry Eagle, in consideration of $732.00;

Deed, dated July 29th, 1902, from executors of G. S. Biby to H. A. Robson and L. M. LaFollette, for 447.10 acres, undivided, in consideration of $3578.80;

Deed, dated July 28th, 1902, from three of the surviving heirs of Richard Oakley to L. M. LaFollette and H. A. Robson, for 101 acres undivided, in consideration of $812.00;

Deed, dated July 30th, 1902, from the heirs of Edward A. Biby to L. M. LaFollette and H. A. Robson for 121.94 acres undivided, in consideration of $4975.62;

Deed, dated August 11th, 1902, from the heirs of Elizabeth O'Connor to L. M. LaFollette and H. A. Robson for 468 acres, undivided, in consideration of $3744.00.

Deed, dated September 10th, 1902, from the heirs of Emma Augusta Phillips, one of the heirs of Richard Oakley, to L. M. LaFollette and H. A. Robson for 37 1/6 acres, undivided, in consideration of $297.03;

Deed, dated October 6th, 1902, from the heirs of Frederick D. Devereaux to L. M. LaFollette and H. A. Robson, for 40 acres, undivided, in consideration of $240.00;

Deed, dated October 13th, 1903, from Henry Oakley to L. M. LaFollette and H. A. Robson for 427 acres, undivided, formerly held by G. T. Snow, Trustee, in consideration of $3416.00.

The defendants, LaFollette and Robson, having succeeded in acquiring all of the land except the interest then owned by plaintiffs, and being unable to obtain this interest from the owners, entered into an agreement with John Baker White, whereby he agreed to purchase the same at a sale by the school land commissioner in said suit, and thereafter execute a conveyance thereof to LaFollette and Robson, for a consideration

of $8.00 per acre. Pursuant to this agreement White, on October 12th, 1903, purchased, and obtained a deed, from the school land commissioner; and on the following day conveyed to LaFollette and Robson.

Robson and LaFollette, prior to the school land commissioner's sale, had redeemed 1457.02 acres undivided, as representing the interests for which they held conveyances, leaving a remainder of 495.5 acres, unredeemed, to cover the 427.5 acres owned by Henry A. Oakley at the time of the forfeiture and the interest then owned by the plaintiffs, estimated to be 68 acres. These defendants had also, previous to the sale, purchased the Henry A. Oakley interest through said John Baker White, with the agreement that this interest should likewise be sold by the school land commissioner and purchased by White, in order to convey it along with the interest of plaintiffs to said defendant, which was accordingly done.

After the institution of the school land proceeding, considerable correspondence passed between the plaintiff Edwin S. Allen, a resident of New Jersey, representing himself and the other plaintiffs, who also lived beyond West Virginia, and White, LaFollette, Robson, and S. E. Bradley, commissioner of school lands of Boone county, showing plaintiffs' insistent offer to contribute their share of the taxes, and the continued effort by Robson and LaFollette to purchase plaintiffs' interest. The originals of most of the letters to Allen had been misplaced, and defendants saw fit to introduce carbon copies of only a few of them. Extracts from, and references to, letters in the record are set out as follows:

Edward S. Allen to J. B. White, October 3d, 1902: ''You can advise the purchasers of the *1849* acres that we will bear our proportion of the taxes upon the tract. In regard to the other claims, we have nothing to do with them''.

Edwin S. Allen to J. B. White, November 13th, 1902: ''As I wrote you before, we are ready to pay our proportion of the taxes upon the tract of 1951 acres, in which we have an interest. In other words, we desire to maintain our proportion of the common interest, * * * * * If Mr. LaFollette prefers to have an absolute ownership of the entire tract, we will sell to him for $8.00 per acre net, and will execute a quit

claim deed upon acceptance of this offer prior to December 1st''.

Edwin S. Allen to L. M. LaFollette, November 13th, 1902: ''Understanding that you have acquired a large interest in a tract of 1951 acres of land in West Virginia belonging to Henry Oakley, Dr. John Byrne and others, and that you propose to make settlement of the back taxes on the same, I would notify you that the interests belonging to the estate of Frederick C. Oakley and Richard A. Oakley, heirs of Richard A. Oakley, one of the owners of said tract, stand ready to pay the taxes which may be due upon their proportion of the common interests, upon advice of the amount required, which may be sent to me at this address''.

Edwin S. Allen to H. A. Robson, January 8th, 1903: ''Referring to our interview last December in regard to some lands in West Virginia in which the estate of Richard Oakley has an interest,—I have not seen any of the other parties since then but have had an interview by telephone with Judge Silkman. It seems that it might be a good investment for them to pay for their share of the taxes standing against the property, *as they are ready to do,* and participate in the sale which you and Mr. LaFollette will doubtless make to good advantage before very long. If you desire, however, to entirely control the entire tract, I think that these small interests could be acquired for $10 or $12 an acre. At the rate you offer, $8 an acre, it would seem to be more to their advantage to retain their interests and participate in the eventual profits of the sale''.

In reply to letter from LaFollette, dated March 25th, 1903, relative to purchase of plaintiffs' interest, Allen by letter on March 30th, 1903, offered to accept $800.00.

On August 11th, 1903, and September 21st, 1903, Edwin S. Allen wrote S. E. Bradley, commissioner of school lands of Boone county, for information concerning the school land proceeding. Allen also wrote Bradley October 8th, 1903, advising that the plaintiffs were willing to pay their proportion of the taxes.

· Allen to LaFollette, October 8th, 1903: ''I am just in receipt of notice that Mr. S. E. Bradley, commissioner of school lands for Boone county, intends selling a certain num-

ber of acres of the 1951 acre tract, of which I understand you are the owner of a large interest. I know of no authority by which he can pick out any number of acres and sell them for balance due on tax bill. *The people whom I represent are willing to pay their share of the taxes, but are unwilling to pay the shares of others.* I enclose you copy of letter which I have written to Mr. Bradley so that you may be advised in the matter, because my people will protest at the proper time any such proceedings as seem to have been indulged in in respect to this property''.

On December 17th, 1903, LaFollette wrote Allen contending that he had acquired the title of plaintiffs under the school land commissioner's sale, and further added: *"As to the value of the property I don't believe that if your acreage were assigned to you it would sell for sufficient to pay a competent lawyer to examine the title. It is rough mountain land, and there is no thought of improvements of any kind.* * * * * * * We are willing to submit the legal question in closing the proceding in Boone to any competent lawyer you may select in Charleston, and if he finds that you are entitled to any part of this land, that it be set apart to you, you pay the cost of his examination of the title''.

To this letter Allen replied, January 4th, 1904: ''With the terms under which you purchased from Mr. White we have no concern, except that the procedure in Boone county *undertaken apparently with the object of acquiring our interests without paying for them,* have involved your title to the entire tract. As we are entirely satisfied with our legal advice we see no benefit that could be experienced from your proposal to submit the question of your title to a lawyer in Charleston. His opinion would be without any binding force''.

There was no further correspondence between the parties until May 15th, 1919, when LaFollette wrote Allen as follows: ''In 1903 I had some correspondence with you with reference to some lands in Boone county known as the Biby lands, in which you represented certain interests of the Richard Oakley estate. Will you kindly advise me whether you still represent them and are in touch with them? An early reply will oblige''.

Allen's reply of May 23d, 1919: "I represent one of the interests of the estate of Richard Oakley and I am in touch with the others. *We should be glad if you would let us know if there has been any revenue from the lands mentioned over and above the amount necessary to take care of the taxes. It seems to us that there should be some revenue, and we would be glad to have you send us a statement. If no revenue has accrued to take care of the taxes, will you please let us know what our proportion of all back taxes is, as we desire to pay them? We dislike to have the taxes accumulate.*"

LaFollette to Allen, May 28th, 1919: "Your letter of the 23d instant is at hand and I am pleased to know that after all these years you are, as I am, still at the desk. As I recall, there was some one of the descendents of Richard Oakley at the time of our last correspondence represented by you, who claim some little interest in some lands on Joe's Creek in Boone county, known as the 1951 acre tract. We took title prior to that time from all the other claimants, including the heirs and devisees of Richard Oakley, and in a suit by the commissioner of school lands of Boone county John Baker White became the purchaser of the State's title to the interests represented by you and some others, and conveyed to us. We have, therefore, had the title to these lands, including absolute and undisputed possession thereof, for all these years, and paid the taxes upon the same. At the time of our last correspondence you proposed to have the heirs of Richard Oakley represented by you, for a certain consideration quit-claim to us, but no agreement was arrived at. While there can be no doubt at all but that our title to all these interests is absolutely good and indefeasible, I shall be inclined to recommend to our people the payment of a nominal sum for such quit-claim as was formerly discussed. I shall be pleased therefore to have you advise me as to what interest your clients formerly claimed, or had, and through what source, and what proposition, if any, you have to make along that line. Our Mr. Robson will be in the East for some weeks after June first and if anything can be agreed upon I will have him come to see you. I would be pleased, therefore, to have you take the matter up at once with your clients and let me hear from you''.

Without further communication between the parties, plaintiffs thereafter instituted this suit in which the bill of complaint was filed at October rules, 1919. In the meantime, on or about the 15th of May, 1919, plaintiffs had entered into an agreement with the law firm of Murphy and Wade, of Madison, West Virginia, by which, in consideration of one-third of the plaintiffs' interest in said land, or of whatever may be obtained by reason thereof, the said attorneys agreed to represent the plaintiffs in the recovery of said interest. On the 16th day of May, 1919, plaintiffs also conveyed to defendant Ira G. Sayre, a resident of Charleston, West Virginia, for the sum of $300.00, one-fourth of their interest in said land. It appears that Mr. Wade, of the law firm of Murphy and Wade, went to New York to see Allen, at which time the arrangements were made between them for the employment of Murphy's law firm and the conveyance to Sayre for an interest in the property.

The plaintiffs predicate their right to recover on the theory of cotenancy existing between them and the defendants LaFollette and Robson and other defendants claiming under them. The defendants deny the existence of such relation and claim they have become vested with the plaintiffs' title for the reasons following:

(1) That although the attempted sale and conveyance by the school land commissioner to John Baker White of an undivided interest in land was unauthorized by Chapter 105, Code, the same has become validated by the curative statute of 1905, Section 19, Chapter 105, Code.

(2) That notwithstanding said Section 19, Chapter 105, may not apply to such sale and conveyance so as to vest title in the defendants, the plaintiffs are nevertheless estopped to assert title in themselves on account of their laches.

(3) That even assuming there is insufficient foundation for either of the two preceding propositions, the defendants have acquired plaintiffs' title by ouster and ten years subsequent adverse possession, under the statute of limitations.

We will discuss these propositions in the order stated.

(1) Have defendants acquired plaintiffs' title under the sale and conveyance by the school land commissioner, as af-

fected by Section 19, Chapter 105? It was apparently admitted in oral argument that Chapter 105 does not authorize the redemption or sale of undivided interests in real estate. That this is the proper view of the law, there can be no question.

"Under the provisions of Section 17, of Chapter 105, Code, Section 3329, Code of 1906, the owner of an undivided interest in land may fully redeem the tract in respect to which he owns such interest, if the same be open to redemption, by any other or all the owners under the same title, since redemption, like forfeiture, must always be of full fee simple title of so much of the land as is redeemed, not of mere interests or estates therein". *State* v. *King*, 64 W. Va., 546. At page 557 of the Court's opinion, by Judge Poffenbarger: "An undivided interest in land, forfeited for non-entry or sold for delinquency, entitles the owner to redeem. *His interest is not severed from that of his associates. It extends to every particle of the land.* In case of tenancy in common, each tenant has the right to the possession of every atom of the land, and the possession of one is the possession of the other. *The right of redemption is analogous. The State never accepts partial redemption by undivided interests.* One who redeems must pay all the taxes on the tract, no matter what his undivided interest may be. Nor does a person have to be sole owner to have the right of redemption. Though having only an undivided interest, he is an owner and the State will not release his interest except upon payment of the entire tax. When that is done the entire land, as to all taxes, under the particular title, must be redeemed."

*Toothman* v. *Courtney*, 62 W. Va. 167, *Caretta Railway Co.* v. *Fisher*, 74 W. Va. 115, and *Shrewsbury* v. *Horse Creek Coal Land Co.*, 78 W. Va. 182, involving sale for taxes of undivided interests in land, announce the same principle.

Counsel join issue as to the effect on the sale and conveyance by the school land commissioner, of Section 19, Chapter 105, Code, which provides:

> "Whatever right, title, interest and estate the State of West Virginia had in any lands at the date of the sale or conveyance thereof, or instrument purporting to

convey the same, heretofore made by said State, through and by the commissioner of school lands of any county under an order or decree of the circuit court in any suit or proceeding under said Chapter One Hundred Five of the Code, however derived or claimed, shall be deemed and held to have passed to and vested in the grantee thereof, whether the land so sold was proceeded against as forfeited, escheated or waste and unappropriated land, *notwithstanding any irregularity or error in such proceeding or informality in such sale, or conveyance or purported conveyance, or want of jurisdiction in the court to decree such sale;* and all such sales and conveyances and purported conveyances are hereby confirmed and made good and valid''.

Counsel for plaintiffs say that the question is controlled by the rule governing tax sales and deeds. The cases of *Toothman* v. *Courtney,* and *Caretta Railway Co.* v. *Fisher, supra,* hold that the curative statutes relating to tax sales and tax deeds are inapplicable to sales and conveyances of undivided interests in tracts of land based upon assessments of undivided interests in real estate as such, or as an aliquot part of the whole. Counsel for defendants, on the other hand, contend that this rule should not be applied, as the statute in question was meant to validate *all* sales and conveyances made under Chapter 105.

Without determining this question, we have concluded that Section 19, Chapter 105, has no application, for the reason that at the time of its taking effect there was no title in the State upon which to operate.

Two years before the statute, the whole title of the land had passed from the State to the plaintiffs and defendants, as cotenants, by direct redemption of part and indirect redemption, through the guise of sale, of the remainder.

''A tax purchase by one tenant in common of the land owned in common is but a redemption, and inures to the benefit of the cotenants. So with a purchase under a sale of land under the common title forfeited for taxes, and sold by commissioner of school lands.'' *Cecil* v. *Clark,* 44 W. Va. 659.

Defendants claim that White did not purchase as agent for Robson and LaFollette; but the law upon the facts conceded placed him in that capacity. It was agreed before the sale

that White should purchase and convey to LaFollette and Robson. The fact that he was to receive, for making the purchase, the difference between the amount to be paid the school land commissioner for the property and $8.00 an acre would make no difference. Whether White was to receive compensation for his time, or an amount for his services depending upon the purchase price to the school land commissioner, he was nevertheless acting on behalf of LaFollette and Robson. Courts of Justice look beyond the screen of mere form to the substance of transactions.

Notwithstanding the plaintiffs had repeatedly offered to pay their share of the taxes, the defendants directed or permitted the attempted sale for their own benefit; and immediately asserted adverse title, under claim of *bona fides*, in answer to plaintiffs' renewed offer to pay.

This is neither the case of direct purchase by a cotenant of the common property for taxes, (*Cecil* v. *Clark, supra*), nor of indirect purchase through a stranger, (*Parker* v. *Brast,* 45 W. Va. 399); in each of which cases such cotenant is held to be a trustee holding the legal title for the mutual benefit of himself and his cotenants.

The attempted sale here was wholly void and ineffectual as such; but in accordance with the doctrine of *Webb* v. *Ritter,* 60 W. Va. 193, and other cases of this Court (that the payment of all taxes even under illegal assessments of undivided interests releases the land), it operated to complete the redemption begun by defendants in the previous payment of the greater part of the taxes. To hold that this sale, void as such, is also inoperative to perfect a redemption of the land, would mean that there has been no redemption of any part of the land, notwithstanding the State has received all of its taxes. The principles of *State* v. *Jackson, Caretta Railway Company* v. *Fisher, Toothman* v. *Courtney,* and *State* v. *Guffy, supra,* require the redemption of the whole title or none.

(2) The second defense of defendants' is laches. "Laches has been defined to be: 'Such delay in the enforcement of one's rights as works a disadvantage to another; or, such delay without regard to the effect it may have upon another as will warrant the presumption that the party has waived his

right.' "  O'Neil v. Moore, 78 W. Va. 296, 307; 88 S. E. 1044.

But as plaintiffs were vested with legal title, after redemption of the common property by defendants in the school land proceeding, the defense of laches has no application.

"Where one is vested with the legal title to land, laches will not defeat a suit for it when the right is yet not barred by the statute of limitations applicable to it." Waldron v. Harvey, 54 W. Va. 608. From the Court's opinion by Judge Brannon: "In addition, this case is one of legal title and is governed by the statute of limitations—that is, the right to the land; and as that statute does not bar the plaintiff, as will be presently sought to be shown, laches cannot bar, as clearly a right yet good under the statute is not lost by laches. Laches applies to equitable demands where the statute of limitations does not."

But suppose the plaintiffs were relying solely upon an equitable title against which the defense of laches could be set up? What has happened during fifteen years' delay of suit by the plaintiffs, after their insistent offers before and after the attempted sale, to contribute their share of the delinquent taxes?

The defendants state in their petition for this appeal that the value of the land in the year 1903 was very small; that thereafter for a number of years its value was slight; that its value increased only slightly until the discovery of oil (on adjoining property) in 1918. The defendants have spent little, if any, money on the property and could not have been prejudiced by delay on the part of the plaintiffs to compel recognition of their title. Not only this, but the defendants have received large sums of money from the sale of the timber and leasing of the oil and gas.

(3)  The defendants make their final stand on the defense of ouster of the plaintiffs and ten years subsequent, adverse possession, under the statute of limitations. The property was wild, rough, mountain land. As already shown, prior to the time the defendants LaFollette and Robson began to acquire interests therein, its ownership was vested in a number of persons living beyond the borders of the State, who had been represented by Colonel Thomas L. Broun, an attor-

ney at Charleston. No taxes had been paid since 1869, but Broun exercised careful oversight of the possession by keeping tenants on the land. The chief of such tenants was Thomas M. Foster, who also served as agent to secure other tenants for the owners. November 20th, 1890, John Byrne, acting for himself and his cotenants, gave to Foster and his wife, Annie, a written lease covering 30 acres of the 1951 acres, where they had resided for many years, during their joint lives and the life of the survivor. At the time of the sale and conveyance by the school land commissioner, October 12th, 1903, the following persons, placed in possession by Thomas M. Foster or his widow, were living on the land: G. W. Carr (by Thomas M. Foster), who remained until 1909 or 1910; Cornelius Vealey (by Thomas M. Foster), who remained until 1909; and Thornton Buzzard (by the widow of Thomas M. Foster), who remained until about 1914. Tom Carr, the son of G. W. Carr, who bought the household effects of Cornelius Vealey and moved into the house vacated by Vealey in the year 1909, lived there until about 1913. No one else appears to have been in possession prior to 1914 or 1915, except William Estep who, by permission of George Carr, moved into the house vacated by the latter in 1909 or 1910, and some timber men who operated a tramroad a quarter of a mile in length over the property for about one year under authority from LaFollette in the year 1903. It does not appear, however, whether this permission was obtained before or after the school land commissioner's deed. Hence such possession is without bearing.

The defendants, to establish ouster of the plaintiffs, which had continued for ten years before the institution of suit, rely upon G. W. Carr, Thomas Carr, Cornelius Vealey, William Estep, and Thornton Buzzard as their tenants. They say that in 1904, while LaFollette was on the property looking for timber cutting trespass, he requested G. W. Carr to prevent the cutting of timber on the property, and told him to go ahead and use the land he had been cultivating. It is also claimed that about the year 1904 Robson visited the property and saw Thornton Buzzard. At this time Buzzard inquired of Robson the ownership of the land. The latter re-

plied that it was his. Buzzard says: "I told him (Robson) I leased from the Widow Foster and her old man, and he got a life lease from Broun so if he died before she did she would have a home. He didn't say anything. I told him how I came in possession of it and he said he would like for me to notice around over in there and see that no damage was done to the land, or words to that effect."

This is in substance the evidence relied on to show an ouster of plaintiffs and attornment of their tenants, Carr and Buzzard, to the defendants. There was no change in the character of the possession of either of these tenants, after their conversations with Robson and LaFollette. Besides, the requests on the part of LaFollette and Robson to Carr and Buzzard to observe that no trespassing was done to the property were not inconsistent with plaintiffs' ownership, as cotenants with the defendants.

In connection with the defense of ouster, attention has been directed to the adverse claim of defendants, announced in LaFollette's letter to Allen, December 17th, 1903, before the alleged tampering with plaintiffs' tenants. This fact might have been proper, with other evidence, as tending to show that a subsequent exclusive holding by defendants was adverse to, and constituted an ouster of, plaintiffs; but as the defendants did not acquire exclusive possession of the property until within less than ten years prior to the institution of suit, such prior notice of adverse claim of ownership becomes immaterial.

"The attornment of a tenant to any stranger shall be void, unless it be with the consent of the landlord of such tenant, or pursuant to, or in consequence of, the judgment, order, or decree of a court." Sec. 4, Chapter 93, Code.

"A tenant in possession cannot disclaim his landlord's title without surrendering possession to him. He cannot collude with and attorn to another claiming a hostile title to the prejudice of his landlord." *Stover* v. *Davis,* 57 W. Va. 196.

"If a tenant takes a secret lease or conveyance for the land from a third party, claiming to be the owner, without the knowledge of his landlord, the character of his possession will not be changed." *Voss* v. *King,* 33 W. Va. 236.

A tenant in this State cannot, by recognition of title in, or attornment to, another, render his holding adverse to the landlord until and unless notice of his disclaimer has been distinctly and unequivocally brought home to the landlord. *Swan* v. *Young,* 36 W. Va. 57; *Point Mountain Coal & Lumber Co.* v. *Holly Lumber Co.,* 71 W. Va. 21; *Guthrie* v. *Beury,* 82 W. Va. 443.

There is no claim of notice to plaintiffs of disclaimer by any of their tenants, nor is it shown that either Carr or Buzzard thought he was expected to hold under a new and adverse title, after the conversations with LaFollette and Robson.

On June 6th, 1912, defendants leased the land for oil and gas to the Guyan Oil Company for a yearly rental of $1.00 per acre; and executed a second oil and gas lease January 4th, 1913, to the South Penn Oil Company for a yearly rental of $1.00 per acre. June 15th, 1914, they sold to Joe's Creek Lumber Company at $25.00 per acre the merchantable timber, which was thereafter removed. The defendants also executed an oil and gas lease to the Columbus Producing Company on September 14th, 1915. Under this lease the first oil producing well on the property was completed about July 25th, 1919, a short time prior to this suit. Since the completion of this well other producing oil wells have been drilled on the property and it is now considered valuable as oil territory.

We are of opinion, therefore, to affirm the decree of the circuit court.

*Affirmed.*

### ON APPLICATION FOR REHEARING:

Defendants, through able counsel, in a petition for rehearing emphasize four propositions:

(a)   That the position of defendants, LaFollette and Robson, who bought into the property after the forfeiture to the State, is superior to that of their grantors.

Upon this assumption it is argued that these defendants were not charged with the usual obligation resting upon each cotenant to protect the title of the common property in the interest of all. The proposed distinction is, in our opinion,

without merit. In *Cecil* v. *Clark,* cited, the defendant John-
son did not become interested in the land until after it was
burdened with delinquent taxes and forfeiture under the
title of his cotenants, Chapman and Hall heirs. Owning
only an undivided interest therein, he undertook to trans-
fer the entire property, including the benefit of its purchase
for taxes, to the defendant, Flat Top Coal Land Association,
a stranger to the title. Discussing the effect of the tax pur-
chase and deed taken by the Flat Top Coal Land Association,
pursuant thereto, as well as deed obtained by this defendant
from the school land commissioner under alleged forfeiture,
the Court states:

"The purchase of a tax title or other title by a cotenant in-
ures to the benefit of all. * * * And as the coal com-
pany derived title from Johnson, and stood in his shoes, it
occupies no different place from him. It took the tax title
assignment then as he had it. That coal company was in law
cotenant with the plaintiffs in these cases as to the rights
justly belonging to them, and the same line of remark applies
to said coal company as regards its redemption in the circuit
court of McDowell county in the year 1885, above spoken of.
That redemption inured to the benefit of the Chapman and
Hall heirs who had not by their act passed their title." In
the process of redemption the coal company, under order of
the court had obtained a deed from the school land commis-
sioner for the State's right, title and interest in the land.

(b)   That Section 19, Chapter 105, Code, in express terms
passes whatever right, title, interest and estate the State had
in any lands at the date of the sale or conveyance thereof in
a suit or proceeding under Chapter 105, and not "such right,
title, interest and estate as it had at the date of effectiveness
of" the statute. In other words, according to this view, it
would make no difference that the attempted sale effected a
redemption and reinvestment of the title in the former own-
ers proportionate to their original interests; this act passed by
the legislature years afterward should, nevertheless, be given
force and effect in this case by taking the plaintiffs' property,
in which the State has no right, title or interest, and con-
ferring it upon the defendants. Such construction would

render the statute unconstitutional, as depriving the owner of property without (any) process of law. At the time the statute became effective, the title to the land, by reason of the previous redemption, was unaffected by the forfeiture or attempted sale.

(c)   That the sale and conveyance by the school land commissioner of undivided interest in the land was not void.

This proposition rests upon the theory that the court, having general jurisdiction, could determine its own authority. The question, however, is not one of fact which may be determined by the court. Chapter 105 does not authorize the sale of undivided interests in lands under any state of facts. The principle is exemplified in *Hoback* v. *Miller,* 44 W. Va. 635, and other West Virginia cases.

(d)   That although the sale and conveyance by the school land commissioner were void, the same nevertheless constituted a grant from the State which ripened into title, under Section 3, Article XIII of the Constitution, by the defendants' subsequent payment of taxes. The fallacy of this position is apparent. The operation of the constitutional provision is dependent upon title being vested in the State. A claimant thereunder can not extract an unforfeited title by mere payment of taxes. The State has had no title since its redemption by the defendants for the joint benefit of themselves and their cotenants.

If the attempted purchase of an undivided interest from the school land commissioner by defendants LaFollette and Robson completed redemption of the land, as we have held, then they could have acquired the plaintiffs' title only by contract or ouster and adverse possession for the statutory period. The conclusion that the property was completely redeemed, therefore, renders the questions raised by the petition unimportant and inapplicable.

*Petition refused.*