LOUIE CONDRY, TRUSTEE, OILCO, INC., *a Corporation, et al., etc.*

*v.*

W. E. POPE, THE EUREKA PIPE LINE CO., *a Corporation, et al.*

(No. 12736)

Submitted January 21, 1969.     Decided March 11, 1969.

*Orville L. Hardman, James M. Powell,* for appellants.

*Simon & Simon, Henry W. Simon,* Ft. Worth, Tex., for appellee Pope.

*Harold M. Garrett,* for Consolidated Gas Supply Corp.

*Stathers & Cantrall, W. Mote Thompson, Jr.,* for Ashland Pipe Line Co., and Ashland Oil & Refining Co.

BERRY, JUDGE:

This action was instituted in the Circuit Court of Doddridge County, West Virginia, on December 10, 1964 by the plaintiffs Louie Condry, Trustee, Oilco, Inc., a Corporation, Frank W. Rose, Hudson Russell, Trustee, W. D. Anderson, J. E. Robinson, E. C. Grindstaff, E. J. Grindstaff and Odell Howard, against the defendants W. E. Pope, The Eureka Pipe Line Company, a Corporation, Ashland Oil and Refining Company, a Corporation, Ashland Pipe Line Company, a Corporation and Hope Natural Gas Company, a Corporation, (which later became Consolidated Gas Supply Corporation, a Corporation), to enjoin the defendants from operating and producing, withdrawing, transmitting and transporting oil, gas and minerals from four wells drilled on plaintiffs' leasehold, for an accounting and damages for such oil, gas and minerals produced, extracted and sold from the wells located on their leasehold and for a special commissioner or receiver to be appointed to operate said wells. The trial court denied the relief prayed for in connection with the wells heretofore drilled by the defendants and any damages sought as a result thereof on the ground that such relief was barred by laches. The judgment of the trial court entered on May 22, 1967 provided that nothing in the judgment should be taken to

interfere with the defendants in producing oil and gas in the future from the present wells from which they were producing and that nothing in the judgment should be taken to authorize said defendants to drill additional wells. An appeal from this judgment was granted by this Court on March 18, 1968 and the case was submitted for decision on arguments and briefs at the January Regular Term, 1969.

The controversy involved in this litigation arose by virtue of an oil and gas lease covering the entire originally estimated 450 acre tract of land in Doddridge County, part of which is claimed by the plaintiffs and part by the defendants. On June 12, 1961 Charles C. Smith and others executed an oil and gas lease to Duncan Sartain for the alleged 450 acre tract of land. On June 24, 1961 Sartain executed an assignment of the "west 225 acres", intended to be one-half of the original lease, to a partnership composed of the plaintiff Condry and others. Sartain reserved an overriding one-sixteenth interest which was also assigned to the plaintiff on July 17, 1961. These conveyances did not contain a description by metes and bounds but referred to deeds which contained metes and bounds descriptions. However, on August 11, 1961, apparently at the request of the plaintiffs, Sartain by two agreements conveyed by metes and bounds the same leases or assignments for oil and gas which had heretofore been made to the plaintiffs on June 24, 1961 and on July 17, 1961.

The other half of the supposed 450 acre oil and gas lease was further subdivided by Sartain who assigned the southern 150.76 acre tract on the eastern side to Ray Blackwell and S. H. Murry who then transferred it to the defendant W. E. Pope by assignments on October 9, 1961, October 23, 1961 and November 30, 1961.

This subdivision of the original alleged 450 acre tract placed parcels in the hands of different persons who were all engaged in the development and production of oil and gas, and thereby caused the arguments over the boundaries of the respective parcels and tracts. However, before any controversy arose with regard to the boundary lines be-

tween the respective parcels or tracts, Sartain, who lived in Doddridge County at the time, talked with Condry who lived in Texas and they entered into an agreement that they would have a dividing line run between the eastern and western halves of the alleged 450 acre tract and each would pay half of the cost of the running of the line. Sartain, in accordance with the agreement, engaged Matt Holt, a civil engineer of Weston, West Virginia, to run the line. It is not clear from the evidence as to exactly what happened but Holt stated that either Blackwell or Sartain showed him where to start the line and without surveying the alleged 450 acres in question he ran a line north which was supposed to divide the tract in half. At the time this line was run in September, 1961, the defendant Pope had no interest whatsoever in the land.

It appears that Holt was asked to do nothing but run a dividing line which he made plainly visible by stakes and brilliant red colored flags of plastic tape used by surveyors. The evidence indicates that Holt ran a line in the vicinity to check whether the post pointed out to him was in the boundary line but he made no survey or calculations as to whether half of the alleged 450 acres would be on each side of the line which he ran due north from the post pointed out to him.

It appears that the plaintiffs drilled a well around August, 1961, on their supposed half of the original 450 acre tract which was finished in a comparatively short time and became a producing well. The Holt line was plainly visible by anyone on the premises where the wells were drilled. The defendant Pope, who also lived in Texas, had never been on the property involved in this litigation during any of these transactions. He made a trip there in September, 1961, and observed the flags placed on the presumed property dividing line by Holt and soon thereafter started a well east of the purported flagged dividing line about October 15, 1961. A second well was drilled later in 1961 and two more in 1962, the last well being completed on June 14, 1962. Each of the wells took several weeks to

complete the drilling and all were located on the eastern side of the flagged Holt line but quite near to it.

The defendant Pope contended that he thought the flagged line was the dividing line between the leases and all four wells drilled by him were east of said line and located on his oil and gas lease. It appears that the defendant spent over $100,000 in the drilling of the four wells, laying the pipe lines, and producing the oil and gas therefrom in order that it could be delivered to the pipe line companies which were also made defendants. According to the record about $50,000 was realized from the oil sold and delivered to the pipe line companies. When this controversy arose and the oil and pipe line companies were notified with regard to it, payments to the defendants were stopped and placed in escrow as provided by contracts until the difficulties between the plaintiffs and defendants could be resolved.

Some time during 1962 Gregg Morris who was on the grounds looking after the plaintiffs' lease operations in Doddridge County, along with others associated with the plaintiffs, observed that the division line run by Mr. Holt might be too far over on the plaintiffs' side and discussed the matter with Condry and his associates. However, nothing was done about it until some time in 1963 when the plaintiffs had the Dean Engineering Company of Buckhannon, West Virginia, survey the entire tract, and this survey indicated that the defendant Pope's four wells were located on the plaintiffs' lease. On August 23, 1963, after the survey had been made, the plaintiffs' attorney wrote to the defendant Pope and advised him that it appeared that the defendant Pope's wells were located on the plaintiffs' lease.

The Dean Engineering Company's survey which was the only survey made of this property was introduced into evidence by the plaintiffs as an exhibit and clearly disclosed that the Holt line was inside plaintiffs' lease about 300 feet west of the north-south line of 225.76 acres conveyed by Sartain to the plaintiffs. The defendant Pope, after receiving the letter from the plaintiffs' attorney, asked for

indulgence stating that he wanted to have a survey made of his lease, which was never done. The Dean survey shows that the original area did not consist of 450 acres as stated by the parties but consisted of 443.80 acres. Inasmuch as the plaintiffs had Sartain convey to them their portion by metes and bounds which resulted in them obtaining 225.76 acres, the remaining portion of the original tract then contained only 218.04 acres, and therefore, the division line agreed upon by Condry and Sartain in an attempt to divide the tract equally would by necessity be further west than the actual division line of the plaintiffs' lease by metes and bounds description. The plat or map of the Dean survey shows two lines drawn through the approximate middle of the entire 450 acre tract. One was run from the metes and bounds description given in the second set of conveyances from Sartain to Condry and the other was a calculated division line from the calls obtained from deeds relative to the eastern portion of the entire tract, which calculated line apparently is about 100 feet east of the metes and bounds line inserted on the map.

Regardless of which of the Dean division lines is taken as the true line, the defendants' wells are all completely over on the plaintiffs' side of the lines. It appears from the Dean map or plat that Sartain's metes and bounds description of the part conveyed to the plaintiffs intended to terminate at a post, but that this post was several hundred feet in an easterly direction from the one that Sartain or Blackwell told Holt to start with in running the dividing line. In addition, the last call in the Sartain conveyance to plaintiffs by metes and bounds description contained an error indicating that the division line was 2460 poles in length which would make the distance ten times farther than it should have been. The direction of the line was almost due south and the error was obvious that it should have been 246 poles or about 4000 feet.

After receiving the letter from the plaintiffs' attorney Pope apparently was not then convinced that the four wells in this litigation were on the plaintiffs' property. His reply to this letter on September 14, 1963, asked for

indulgence in order that he could have his lease resurveyed, which, as heretofore stated, was never done although defendant's explanation was that he could not get Matt Holt to go back and make the survey.

The trial court in its opinion stated that by all the facts involved it was clearly shown that the defendants did not act in bad faith and did not wilfully and knowingly drill the four wells on the plaintiffs' lease; that the original dividing line which was in error was partly the fault of the plaintiff Condry when he agreed with Sartain to have the division line run and that he would pay half the cost. The defendant Pope was not a party to the establishment of this dividing line which was taken by him in good faith as the true dividing line before his wells were drilled. The plaintiffs did not take any action until after the defendants had spent about $100,000 in drilling the four wells and it was observed that most were good producing wells.

It is true that the record shows that the locations of the four wells on plats filed with the State Mines Department, as required by law, are highly inaccurate, and the filed plats show them located in entirely different places from the actual location. However, it appears the defendant did not make the state reports or file them. Apparently, they were done by Blackwell who died before this litigation began.

Although the evidence shows that there was considerable confusion in the original description and the flagged line with regard to the leases involved in this case, the dividing line between the particular descriptions contained in the conveyance by metes and bounds by Sartain to the plaintiffs would govern over any general description. *South Penn Oil Co.* v. *Knox*, 68 W. Va. 362, 69 S. E. 1020; *United Fuel Gas Company* v. *Cabot*, 96 W. Va. 387, 122 S. E. 922. This principle is clearly stated in point 2 of the syllabus of the *United Fuel Gas Company* case wherein it is stated: "Generally a particular description of the land in an oil and gas lease by reference to a deed containing metes, bounds, monuments and distances will prevail over a general description as by adjoiners, and estimated acreage."

The confusion over the dividing line between the leases and the lapse of time indulged in by the plaintiffs before any notification was given to the defendants that the wells in question were located on their lease after all had been completed and were producing, tend to show that there was no bad faith on the part of the defendants in the drilling of the wells at the wrong locations. This factor of bad faith relates to the measure of damages but has nothing to do with title and the mere silence or lapse of time will not estop the plaintiffs from asserting their title to the property involved. *Williamson et al.* v. *Jones et al.*, 43 W. Va. 562, 27 S. E. 411, 38 L.R.A. 694; *Pittsburgh and West Virginia Gas Co.* v. *Pentress Gas Co.*, 84 W. Va. 449, 100 S. E. 296. The rule as to damages where such trespass is not wilful, but is the result of a mistake of fact, is that the measure of plaintiffs' damages is the value of the oil and gas after its severance less the reasonable cost of production; that is, defendants should have a credit for their mistaken expenditures. 1 Summers, Oil and Gas, §24; *Williamson* v. *Jones, supra; Pittsburgh and West Virginia Gas Co.* v. *Pentress Gas Co., supra; Spruce River Coal Company* v. *Valco Coal Company*, 95 W. Va. 69, 120 S. E. 302; *Pan Coal Co.* v. *Garland Pocahontas Coal Co. et al.*, 97 W. Va. 368, 125 S. E. 226. A concise statement with regard to this question dealing with the mining and removal of coal from another's property which is applicable as far as the damage elements involving oil and gas in the instant case is found in point 1 of the syllabus of the case of *Spruce River Coal Company* v. *Valco Coal Company, supra*, in the following language: "The true measure of damages for entering upon another's land and mining and removing coal therefrom, unless wilfully done, is the value of the coal after it is taken from the mine or loaded on cars, less the proper expense of such severance." If there has been a wilful and deliberate trespass, the trespasser does not get any credit for his expense but still has to pay for what he took out if the owner asserts a timely claim.

The trial court in holding that laches was applicable to the case at bar and dismissing the plaintiffs' case has in

effect held that although the defendants' oil wells were drilled and located on the plaintiffs' lease the plaintiffs were deprived of the right to assert their legal claim or title to the oil wells located on their lease. This is not the law. In the first place, mere lapse of time, in the absence of circumstances affording evidence of a presumption that a right has been abandoned, is not considered laches. 7 M. J., Equity, §26; *Pownall* v. *Cearfoss*, 129 W. Va. 487, 40 S. E. 2d 886. Then, too, laches can not be set up as a bar to legal title to land where the legal statute of limitations has not yet run. *Waldron* v. *Harvey*, 54 W. Va. 608, 46 S. E. 603; *Allen* v. *LaFollette*, 94 W. Va. 700, 120 S. E. 176. It is clear, under the evidence in the case at bar, that the plaintiffs were vested with legal title to a lease covering the area where the defendants drilled for oil wells.

Judge Brannon, speaking for this Court in the case of *Waldron* v. *Harvey, supra,* in connection with this matter, said: "In addition, this case is one of legal title, and is governed by the statute of limitations—that is, the right to the land, and as that statute does not bar the plaintiff, as will be presently sought to be shown, *laches* cannot bar, as clearly a right yet good under the statute is not lost by *laches*. *Laches* applies to equitable demands where the statute of limitations does not. 'Mere delay in asserting a right, short of the limitation fixed by statute, does not bar the right in equity.' 8 Am. & Eng. Dec. in Eq. 677. If a legal right gets into equity, the statute governs."

The only way the plaintiffs could be deprived of the area in which the defendants' wells were drilled, all of which are within the boundaries of the plaintiffs' lease, would be under a claim of adverse possession which the facts in this case do not warrant. See *Lockwood* v. *Carter Oil Co.,* 73 W. Va. 175, 80 S. E. 814; *Williamson et al.* v. *Jones et al.,* 43 W. Va. 562, 579, 27 S. E. 411; *Carter et als.* v. *Price et als.,* 85 W. Va. 744, 102 S. E. 685 and *Bennett* v. *Bennett,* 92 W. Va. 391, 115 S. E. 436.

It therefore clearly appears from the authorities that the defense of laches can not be asserted in a case such

as the one presented here to deprive a plaintiff of a legal title to the oil, gas and mineral rights within the boundaries of their lease. Therefore, the only question involved in the disposition of a case of this kind is that of damages for minerals already removed, and where the defendant is not a wilful trespasser, the rule with regard to damages in such case in this state, as heretofore stated, is the value of the oil and gas removed from the property covered by the plaintiffs' lease less the cost of the production of such oil and gas. The judgment of the trial court dismissed the action on the sole ground that laches barred any recovery by the plaintiffs, and inasmuch as it is clear that laches does not apply in such manner to the case at bar and the trial court being in error in such holding, it will be necessary to remand the case for an accounting and for the relief prayed for in the complaint.

For the reasons stated herein, the judgment of the Circuit Court of Doddridge County holding that laches barred the plaintiffs from recovery and dismissing their complaint is reversed and the case is remanded to that Court for further proceeding in connection with the injunction and accounting prayed for by plaintiffs in their complaint.

*Reversed and remanded.*