382 S.E.2d 514

**Eugene MILLER and Geraldine Miller**

v.

**DIVERSIFIED LOAN SERVICE COMPANY, and Charles A. Clark, Trustee.**

**Flora Mae VALENTINE**

v.

**DIVERSIFIED LOAN SERVICE COMPANY, and Charles A. Clark, Trustee.**

Nos. 18383, 18384.

Supreme Court of Appeals of West Virginia.

June 8, 1989.

**3.** Mrs. Savas had been married for thirty-three years, had taught school, and had worked in one of her husband's businesses.

James St. Clair, Marshall & St. Clair, Huntington, for Diversified Loan Service Co.

Charles E. Heilmann, Huntington, for Flora Mae Valentine.

Herbert H. Henderson, Huntington, for Eugene and Geraldine Miller.

MILLER, Justice:

These cases have been consolidated for decision and opinion. We consider today whether enforcement of a trust deed, otherwise timely under W.Va.Code, 55–2–5, may nevertheless be barred by laches. The Circuit Court of Cabell County held that laches applied and enjoined sales under the trust deeds. We find this ruling to be erroneous and reverse.

The facts are not disputed. The plaintiffs in each of these cases are homeowners who gave deeds of trust on their property to secure certain notes for home improvement work. Both dealt with the same contractor, State–Wide Supply, Inc. (State–Wide), at about the same time in the late summer of 1972. Their notes were immediately transferred by State–Wide to the Kanawha City Savings and Loan Company (Kanawha City).

Both homeowners became dissatisfied with the work performed by the contractor. One of the homeowners, Mrs. Valentine, instituted a suit for damages against State–Wide and Kanawha City in April, 1974. The other homeowners, the Millers, ceased payments on their note after State–Wide refused to correct the deficient workmanship.

Shortly after these events in 1974, Kanawha City filed for bankruptcy and State–Wide ceased business. The suit for damages by Mrs. Valentine was stayed because of Kanawha City's bankruptcy.[1] Eventually, in December, 1983, the notes were purchased by Diversified Loan Service Compa-

---

1. Mrs. Valentine claims that her attorneys talked with officials of the bankrupt estate, who represented that no attempt would be made to collect on the note without resolution of her complaints.

ny (Diversified) from the bankrupt estate.[2] Diversified made several demands for payment on the notes. It then instructed its trustee to initiate foreclosure under the deeds of trust. This prompted the two homeowners to file separate lawsuits in May, 1986, to enjoin the foreclosure sales.

The circuit court in 1987 ordered that the sales be permanently enjoined because there had been a failure by Diversified and its predecessors to enforce the trust deeds in a timely fashion, causing prejudice to the homeowners. In each case, the court specifically held that Diversified was enjoined "on the ground of laches."

## I.

■ W.Va.Code, 55–2–5, provides, in part, that "[n]o lien ... created by any trust deed or mortgage on real estate, shall be valid or binding as a lien on such real estate, after the expiration of twenty years from the date on which the debt or obligation secured thereby becomes due, unless suit to enforce the same shall have been instituted prior to the expiration of such period." This case presents the question of whether the limitations period specified in that statute is subject to laches. Stated another way: May an express statute of limitations be shortened by the doctrine of laches? For the reasons that follow, we find that it may not.

It is axiomatic that laches is a doctrine unique to equity. It is equity's counterpart to the law's statute of limitations. Where, however, one pursues a legal right within the applicable statute of limitations, the right cannot be cut short by the assertion of laches. This principle was established in Syllabus Point 2 of *Condry v. Pope*, 152 W.Va. 714, 166 S.E.2d 167 (1969), where we said, in part:

"Where legal title is involved in a case, the statute of limitation applicable there-

to governs ordinarily even if the legal title be involved in an equitable proceeding and if such statute does not bar the right to the land, laches can not bar such right. Laches applies to equitable demands where the statute of limitation does not."

*See also Hoffman v. Wheeling Sav. & Loan Ass'n*, 133 W.Va. 694, 707, 57 S.E.2d 725, 732 (1950) ("A defense of laches cannot be invoked in a law action."); Syllabus Point 2, *Stiles v. Schaffner*, 119 W.Va. 424, 194 S.E. 436 (1937).[3]

*Condry*'s facts are rather analogous to this case. The plaintiffs claimed legal title to certain oil and gas and sought an injunction to prevent the defendants from drilling and removing the same. The defendants asserted the defense of laches, claiming that the plaintiffs were tardy in filing suit. Despite the fact that the plaintiffs applied for an equitable remedy, we found that the underlying claim was for the enforcement of their legal title. Because the statute of limitations had not run, we concluded: "[L]aches can not be set up as a bar to legal title to land where the legal statute of limitations has not yet run. *Waldron v. Harvey*, 54 W.Va. 608, 46 S.E. 603 [ (1904) ]; *Allen v. LaFollette*, 94 W.Va. 700, 120 S.E. 176 [ (1923) ]." 152 W.Va. at 722, 166 S.E.2d at 171.

Here, the plaintiffs seek to invoke laches to prevent the trustee of their deeds of trust from bringing about a sale which is not barred by the twenty-year statute of limitations contained in W.Va.Code, 55–2–5. Clearly, under the foregoing law, this cannot be done.

Even prior to the adoption of W.Va.Code, 55–2–5, in 1921, we had indicated that the time period to enforce a deed of trust was twenty years. *See Camden v. Alkire*, 24 W.Va. 674 (1884); *Pitzer v. Burns*, 7 W.Va. 63 (1873). We concluded that a defense of laches was not available.

2. It appears that for a consideration of $176,000 Diversified purchased notes from the bankrupt estate in the aggregate amount of $437,000.

3. This appears to be the general rule elsewhere. *E.g., Morgan v. Koch*, 419 F.2d 993 (7th Cir. 1969); *California State Auto. Ass'n Inter–Ins. Bureau v. Cohen*, 44 Cal.App.3d 387, 118 Cal.Rptr. 890 (1975); *Pasternak v. Robin*, 511 P.2d 529 (Colo.App.1973); *Alley v. Alley*, 137 Ga.App. 256, 223 S.E.2d 288 (1976); *Scott Poultry Co. v. Bryan Oil Co.*, 272 N.C. 16, 157 S.E.2d 693 (1967); *White Pass Co. v. St. John*, 71 Wash.2d 156, 427 P.2d 398 (1967).

■ We, therefore, conclude that W.Va. Code, 55–2–5, is a statute of limitations, as it expressly fixes the time for enforcement of liens created by trust deeds and certain other instruments. The doctrine of laches is inapplicable to shorten this statutory period.

## II.

■ The parties also raise the question of whether Diversified is a holder in due course. It must first be pointed out that in a suit to enforce a lien securing a negotiable note, the same defenses are generally available as would be in a suit on the note itself. *See* 55 Am.Jur.2d *Mortgages* § 1308 (1971). We spoke to this question in *Morgan v. Farmington Coal & Coke Co.*, 97 W.Va. 83, 124 S.E. 591 (1924), where a holder in due course of a note sought to foreclose under a vendor's lien. We recognized in Syllabus Point 7 of *Morgan* that the holder in due course took free of the equities of the original parties:

> "The remedy, free from all equities between the original parties, is fixed as of the time the notes are purchased by the holder in due course, and the character and strength of the remedy is not changed or weakened because the other remedy (suit on the notes) is barred by limitation."

However, it is equally clear that if the holder of the note was not a holder in due course, then all defenses against the original holder would also be available. *See Roane County Bank v. Phillips*, 124 W.Va. 720, 22 S.E.2d 291 (1942); *see generally* 55 Am.Jur.2d *Mortgages* § 1308 (1971); Annot., 127 A.L.R. 190 (1940). Thus, for purposes of determining the defenses available against Diversified, we must look to its status as a note holder under the Uniform Commercial Code.

■ It is not disputed that Diversified purchased the notes in this case from the trustee in bankruptcy for Kanawha City.

It is quite clear under the Uniform Commercial Code, W.Va.Code, 46–3–302(3)(a), that one cannot become a holder in due course of an instrument "[b]y purchase of it at judicial sale or by taking under legal process." Thus, Diversified's purchase of the notes from the bankruptcy court will not in itself accord it holder in due course status.

■ Diversified appears to acknowledge this point, but claims that it is a transferee under W.Va.Code, 46–3–201(1), and that it is vested with the same rights as its transferor.[4] This is known in UCC parlance as the "shelter principle": the transferee succeeds to the rights of the transferor even though the instrument is overdue, as is the case here. *See Weast v. Arnold*, 299 Md. 540, 474 A.2d 904 (1984); *see generally* 11 Am.Jur.2d *Bills & Notes* §§ 421, 422 (1963); J. White & R. Summers, *Uniform Commercial Code* 696 (3d ed. 1988). We note that although Diversified's transferor was the trustee in bankruptcy, the trustee obtained no independent status with respect to the notes, but was acting for Kanawha City.

Even though Diversified is considered a transferee, this means only that it is vested with the same rights as the transferor and is, therefore, subject to the same defenses that could be asserted against the transferor. *See Wear v. Farmers & Merchants Bank of Las Cruces*, 605 P.2d 27 (Alaska 1980); *Richardson v. Girner*, 282 Ark. 302, 668 S.W.2d 523 (1984); 4 W. Hawkland & L. Lawrence, *Uniform Commercial Code Series* § 3–201:02 (1984). Consequently, Diversified stands in the shoes of Kanawha City, and whatever defenses the plaintiffs have against it are available against Diversified.

## III.

### A.

■ Several defenses are asserted by the homeowners which we will discuss only

---

**4.** W.Va.Code, 46–3–201(1), provides:

"Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course."

briefly, as there has not been a full factual development below. The first involves the claim that Kanawha City was intimately connected with State–Wide. It is generally held that if the financing institution exercises control over the creditor by supplying the financing forms or determining the amount of credit extended and its terms, such interconnectedness precludes the financing company from becoming a holder in due course. *See, e.g., Schneberger v. Wheeler,* 859 F.2d 1477 (11th Cir.1988) (applying Florida law); *Commercial Credit Corp. v. Orange County Machine Works,* 34 Cal.2d 766, 214 P.2d 819 (1950); *Jones v. Approved Bancredit Corp.,* 256 A.2d 739 (Del.Super.1969); *St. James v. Diversified Commercial Fin. Corp.,* 102 Nev. 23, 714 P.2d 179 (1986); *Unico v. Owen,* 50 N.J. 101, 232 A.2d 405 (1967); *Arcanum Nat'l Bank v. Hessler,* 69 Ohio St.2d 549, 433 N.E.2d 204 (1982); *J.I. Case Credit Corp. v. Skjoldal,* 296 N.W.2d 514 (S.D.1980); *see generally* J. White & R. Summers, *Uniform Commercial Code* § 14–6 (3d ed. 1988); W. Hawkland & L. Lawrence, *Uniform Commercial Code Series* § 3–302:03 (1984). If Kanawha City comes within this rule, the plaintiffs would be able to assert failure of consideration because of the claimed defective workmanship.

### B.

■ Another defense is that of usury under *Carper v. Kanawha Banking & Trust Co.,* 157 W.Va. 477, 207 S.E.2d 897 (1974). In *Carper,* the Court dealt with the usury statute, W.Va.Code, 47–6–5, which at that time limited to 6 percent per annum the interest chargeable between parties to a private contract. The case turned on an interpretation of the time-price doctrine. We held that the doctrine could not be

presumptively asserted as a defense to usury[5] and set out in Syllabus Point 7 a number of factual inquiries that should be made. We also stated in Syllabus Point 10 of *Carper* that the holder of "an instrument with notice of its usurious character is subject to the strictures of the usury law. *Code,* 1931, 47–6–6, as amended."[6] Furthermore, the fact that the Legislature in 1974 amended W.Va.Code, 47–6–5, to alter the legal rate of interest does not benefit Diversified in this case as the notes were executed prior to the legislative change.

### C.

■ In their complaint, the Millers aver that the signatures that appear on their note and trust deed are forgeries. As to the signatures on the note, W.Va.Code, 46–3–401(1), expressly provides that "[n]o person is liable on an instrument unless his signature appears thereon." If, therefore, the Millers successfully prove that their signatures are not authentic, neither the note nor the trust deed may be enforced.

When the authenticity of a signature is disputed, the burden of proof rests on the party who claims under the signature. This burden is eased by a presumption of authenticity. Under W.Va.Code, 46–3–307(1)(b), the trier of fact is required to find that the signature on an instrument is authentic unless sufficient evidence to the contrary is presented. We discussed the quantum of evidence necessary to rebut the presumption of authenticity in Syllabus Point 2 of *First Nat'l Bank in Marlinton v. Blackhurst,* 176 W.Va. 472, 345 S.E.2d 567 (1986):

"Under *W.Va.Code,* 46–3–307 [1963], after a plaintiff suing on a note has made a *prima facie* case as to a signature's genuineness, a denial of the signature's

---

**5.** Syllabus Point 5 of *Carper* states:

"A contract though it may be couched in the form of a time-price doctrine is not presumed to be exempt from the application of the usury laws. If a transaction is actually a device to evade usury laws, it is not saved by any attempted differential between a claimed 'cash price' and a claimed 'credit price.' Thus, if the sale of personal property is really made on a cash estimate, and time is given to pay

the price, and an amount is assumed to be paid greater than the cash price with legal interest, the transaction may be, in fact, usurious."

**6.** The notes in this case provide, by simple calculation, for an equivalent simple interest rate of 16 percent per annum in the Valentine case and 18 percent per annum in the Miller case.

genuineness along with a sample of the defendant's true signature will rebut a presumption of genuineness."

In a somewhat related vein, Mrs. Valentine alleges that her signature was obtained by fraud. W.Va.Code, 46–3–305(2)(c), provides that every holder of an instrument takes it subject to the defense that there was "such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms[.]" This defense was formerly known as "fraud in the factum," "essential fraud," or "real fraud." 4 W. Hawkland & L. Lawrence, *Uniform Commercial Code Series* § 3–305:06 (1984). Like the forgery defense discussed above, fraud in the factum is a complete defense.[7]

### IV.

For the reasons hereinabove set forth, the judgments of the Circuit Court of Cabell County are reversed, and these cases are remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

---

**7.** We note that the defense of fraud in the factum may also have application in the Miller case. In its order, the circuit court stated that "[i]t is possible that plaintiffs signed [the] instruments without knowing their purport or contents."