# CHARLESTON.

O'NEAL v. MOORE.

Submitted April 18, 1916. Decided May 2, 1916.

1. CONTRACTS—*Actions—Burden of Proof.*

    Where one person prepares and signs a writing in duplicate, and mails both copies to another, with a written request that he sign and return one, if it meets his approval, and the latter claims that he signed and delivered one copy to the former in person, which is denied, the receiver of such writing bears the burden of proving delivery. (p. 299).

2. PARTNERSHIP—*Requisites—Execution of Contract.*

    Partnership is a subsisting relation between persons who have agreed to share the profits and losses of some business or undertaking. An agreement to form a partnership does not of itself create the relation; it must have been executed by mutual performance of the things contemplated. (p. 302).

3. SAME.

    A writing signed by two persons, agreeing to secure options on certain tracts of land, resell the same for speculation and divide equally the profits, neither party being permitted to charge for his personal services, and both agreeing to use their best efforts to effect a sale, does not prove a partnership. The contemplated events must have occurred in order to establish the relation of partners. (p. 303).

4. EQUITY—*Laches—Ignorance of Facts.*

    Ignorance of facts is no excuse in equity for unreasonable delay in asserting one's right, when such ignorance is wilful and results from lack of proper diligence to seek well known sources of information. (p. 306).

Appeal from Circuit Court, Barbour County.

Suit in equity by S. L. O'Neal against S. A. Moore. From a decree for plaintiff, defendant appeals.

*Reversed, and suit dismissed.*

*J. Blackburn Ware* and *Cato & Bledsoe,* for appellant.

*J. Hop. Woods,* for appellee.

WILLIAMS, PRESIDENT:

The purpose of this suit in equity is to establish a partnership or joint enterprise, alleged to have been entered into between plaintiff and defendant, for the purpose of securing options on certain coal lands, designated in the record as the "South Philippi Coal Field," and selling the same for profit, and for an accounting of the profits. Plaintiff alleges defendant procured the options and resold the land in his own name, made a large profit, and refuses to account to him for his share.

In a carefully prepared written opinion, made a part of the record by the court's order, the circuit judge held that plaintiff was entitled to relief, and referred the cause to a commissioner to state an account. Although we do not concur in the conclusions reached by the learned judge, we have, nevertheless, found his opinion, as well as the elaborate briefs of counsel, very helpful in considering the material portions of the testimony scattered throughout a voluminous record.

The actual existence of the alleged partnership depends almost wholly on conflicting oral testimony and the conduct of the parties. Plaintiff's chief reliance is on a certain written contract, alleged to have been made between plaintiff and defendant, bearing date the 2nd of May, 1905, which reads as follows:

"This contract made this 2nd day of May, 1905, between S. A. Moore, of the first part, and S. L. O'Neal, of the second part:

"Witnesseth: That the said Moore and O'Neal have this day agreed to secure leases upon the following farms, viz., Alman Poling, Absalom Poling, Nath. Saffel, Grogan's heirs,

Wash. Fridley heirs and W. Pritchard, in all nearly one thousand acres, situate near Philippi, West Virginia, and each of the parties hereto is to use his best endeavors to sell the coal and coal mining rights and the profits accruing from any such sale are to be divided equally 'and the expenses incurred in such work are also to be paid equally by said Moore and O'Neal, but it is distinctly understood that neither the said Moore or O'Neal are to receive anything for their services in any work that they may do in securing the options.

"Witness the following signatures and seals this 2nd day of May, 1905.

S. A. MOORE     (SEAL)

(Signed)

S. L. O'NEAL     (SEAL)."

This contract was prepared in duplicate by defendant and both copies mailed to plaintiff on the 3rd of May, 1905, accompanied by the following letter:

"I enclose you the contract in duplicate between us regarding the coal field and if the same meets your approval sign one and return to me.

"I also enclose you a blank option, which·if you think is satisfactory you can get whatever is necessary at my office.

"I will possibly not get home until the 12th or 15th and if Alman Poling comes here please instruct him as how to proceed in securing these options."

Defendant lived in, and plaintiff lived very near to the town of Philippi, both maintained offices in the town, and both were engaged in speculation in real estate. Plaintiff was also a civil engineer and land surveyor, and defendant was a banker.

Defendant answered the bill, denying that the alleged con-tract was ever entered into; or, if signed and returned to him, that it was ever performed; and pleads plaintiff's laches in bringing his suit. Defendant admits he secured options on the lands mentioned in the contract, and also on other lands in the same field, not mentioned in the writing, but averred in the bill to have been included in an oral agreement made between the parties, and also that he resold them at a profit. He denies plaintiff rendered any assistance in secur-

ing the options or in making sale, or that he bore any part of the expense. He admits signing and mailing the contract to plaintiff on the 3rd of May, but denies plaintiff ever returned to him a copy thereof, as he was requested by the letter to do. Apparently the only copy now in existence, is the one in possession of plaintiff. Plaintiff swears he signed the duplicate and delivered one copy to defendant in his (plaintiff's) office, about the middle of May, 1905. Defendant denies this. On May 11, 1905, he wrote plaintiff the following letter:

"On May 3rd I sent you contract in regard to the matter about which we talked but have not yet received the return of either of them. Kindly let me hear from you in regard to this matter during this week. Your prompt attention, please."

After receiving this letter, plaintiff swears defendant came to his office to make inquiry of F. L. O'Neal about some maps, and, on that occasion, he delivered to defendant a copy of the contract signed by him. At the bottom of this letter is a pencil memorandum, which plaintiff swears he made about the time defendant was at his office, and which is in the following words:

"Contract of May 2nd, 1905, referred to above delivered personally to S. A. Moore in my office, while Moore & F. L. O'Neal were consulting over maps."

This memorandum is without date, and we concur with the circuit judge, who says such omission looks suspicious, and renders the memorandum of little or no value. We think it is untrustworthy also for another reason. It states a circumstance which has no connection with the contract or its delivery. Considered in the light of F. L. O'Neal's testimony, presently to be considered, this shows an effort to fix an uncertain time, yet near enough to serve the purpose. It is very unusual that such a memorandum should have been made near the time of delivery. It would have been easier to write the date. If it was made after this suit was contemplated, there was danger in stating the exact date, because defendant was frequently away from home. Read in connection with the letter accompanying it, and the letter of May 11th, the writing is in the nature of a proposition or offer, which required acceptance in a reasonable time. It was encumbent on plaintiff

to show he accepted within such time. He claims that he signed and delivered the writing to defendant in person, and not that he mailed it to him, as defendant's letter impliedly authorized him to do, and it is encumbent on him to prove such delivery, if controverted. His testimony that he handed the paper to defendant, about the middle of May, is denied by defendant, and is not supported by the weight of evidence. To corroborate his testimony, plaintiff took the deposition of his nephew, F. L. O'Neal, a civil engineer who occupied a room in his office, and who swears that, on one occasion, de-defendant came to plaintiff's office to see some maps witness had, and he saw plaintiff deliver to defendant a folded paper, and heard him say something about owing defendant a letter. But this witness knew nothing about the character of the paper delivered, nor does he say its character was then mentioned by either party. Furthermore, he does not even remember the month in which that transaction occurred. Hence, his testimony can hardly be said to corroborate plaintiff's. Besides lacking corroboration, plaintiff's testimony, as to the time of his alleged delivery, is discredited by C. W. Brandon, clerk of the circuit court of Barbour county, a disinterested witness, who swears that, sometime in July, 1913, he had a conversation with plaintiff concerning the contract, in the clerk's office, and plaintiff then told him "he didn't recollect where or when he had delivered it." Plaintiff admits having two or three conversations with this witness, about that time, but denies making such statement. Witness says plaintiff had told him, sometime before, that he was going to bring suit against defendant, and witness communicated that fact to him, and he then requested witness to see plaintiff and ascertain whether he had a contract against him, and, if so, what its nature was. Defendant's effort thus to secure information concerning a writing in the hands of his adversary, who was threatening to make it the basis of a suit against him, was perfectly legitimate and natural, and is consistent with his present defense. If the contract had actually been signed by plaintiff and a copy returned to defendant, it is very unlikely that he should have lost it or forgotten its contents. Whatever may have been his purpose respecting its fulfill-

ment, he would naturally have been careful to keep the paper, knowing that a duplicate of it, bearing his signature, was in the hands of plaintiff. Apparently the first direct information he had from plaintiff, that he claimed a right to an accounting of profits, was by letter of December 5, 1912. Defendant had moved from Philippi that year, and was then a resident of Charleston, West Virginia. In that letter plaintiff informed defendant that he had not accounted to him for the profits, and requested that he write him in regard to the matter. This letter was apparently not answered, and plaintiff again wrote him on the 18th of December, and defendant replied, requesting full information concerning plaintiff's claim. On the 23rd of December plaintiff again wrote, calling his attention to the written contract of May 2, 1905, and defendant replied on the 25th, asking for a copy of the contract, but not until the 6th of February, 1913, did plaintiff furnish him or his attorney a copy. At that time he permitted L. V. Holsberry, an attorney at Philippi, to make a copy of it, and so advised defendant of the fact by letter of February 20th, and inquired whether Mr. Holsberry was authorized to make settlement for him. No reply appears to have been made to this letter. Defendant's persistent efforts to obtain a copy of the contract, although they do not prove the contract was not in fact delivered, are, nevertheless, perfectly consistent with his theory of non-delivery. There is a circumstance, however, which we think does corroborate defendant's testimony on this point. He produced what purports to be a carbon copy of a letter, bearing date May 27, 1905, addressed to plaintiff at Philippi, West Virginia, in which he reminds him that he had had no reply to his letter of the 11th of May, and supposed he did not wish to execute the contract, and further says: ''I will, therefore, ask that you return the two contracts to me unsigned, as I have made other arrangements in regard to this matter. I had expected that you would show some substantial interest in the matter, in accordance with our conversation.'' Plaintiff denies receiving such letter, and nothwithstanding his denial may be sufficient to overcome the legal presumption that he did receive it, arising from the proof that it was written and enclosed in an envelope

properly addressed, stamped and mailed, still his failure to receive it does not destroy its force as a corroborating circumstance. If plaintiff returned the contract when he says he did, such a letter would not, in all probability, have been written so soon thereafter. But that the letter was written at the time of its date, is proven by the testimony of defendant and his stenographer, C. E. Robinson. Defendant swears he dictated such a letter to Mr. Robinson and the latter identified the carbon copy, and swears he took the dictation, transcribed it on the typewriter, and retained a carbon copy and mailed the original to plaintiff. This testimony is not contradicted, except by plaintiff's denial of the receipt of the letter. It must be borne in mind that plaintiff has to sustain the burden of proving delivery of the contract within the time specified in the letter of May 11th. If he is a careful business man, and the evidence seems to disclose that he is, it is very natural that defendant should have written such a letter. Because he had signed a writing in duplicate, and had mailed both copies of it to plaintiff, with the request that he sign and return one copy to him, and it is very reasonable that he should be anxious to have both copies returned, if the contract was not to be executed. His signature was on both copies, and he knew, if plaintiff was so disposed, he could place his own name on one copy, at any future time, destroy the other copy and assert mutuality of contract, if the venture contemplated should prove to be profitable. Notwithstanding a contrary finding by the learned judge of the circuit court on this controverted fact, we think the weight of evidence clearly supports defendant's testimony; especially so, in view of the law casting the burden on plaintiff.

But, even if we should be mistaken in our conclusion in regard to the foregoing facts, there are other grounds on which equitable relief should be denied plaintiff. No partnership is proven to have actually existed. An agreement to form a partnership is not of itself sufficient to establish such relation; the agreement must have been executed by investing money or performing services in the joint undertaking. "To constitute the relation of partners the agreement between the parties must be an executed agreement. So long as it remains

executory the partnership is inchoate, not having been called into being by the concerted action necessary under the partnership agreement.'' George on Partnership, sec. 19. 1 Lindley on Partnership 16; *Latta* v. *Kilbourn,* 150 U. S. 524, 37 Law. Ed. 1169; and *Clark* v. *Emery,* 58 W. Va. 637.

Plaintiff invested no money, nor did he assist, either in person or by paying expenses, in taking options on the property, or in thereafter making sale of it; neither does it appear that he incurred any liability therefor. He does claim, however, that he procured Alman Poling to act in his behalf in getting options. Poling lived near Philippi and is one of the owners of land in the field taken up and sold by defendant. In the early summer of 1905, Poling was at Manington, looking after the drilling of an oil or gas well, in which he, as well as plaintiff and defendant, was interested. Plaintiff says he made two or three trips to Mannington, to get him to procure options. Poling did, in the early summer of 1905 procure a few options, but we do not think the evidence is sufficient to show he did so as the agent of plaintiff, and it is certain that his services were of no material benefit. He says he got the options the last of May or June, ''maybe the last of June,'' in the name of O. H. Suck, a man he did not know, but whose name, he says, was furnished him by defendant. Poling does not say he came back to Philippi, at plaintiff's request, for the purpose of securing the options. Being asked by plaintiff's own counsel whether he came back for that purpose, or for other reasons, he replied: ''I was coming back anyhow.'' He lived near Philippi, and says he came back at different times to see about his stock. He says he thinks he took the options when he was at home looking after his wheat harvest, and does not know how long it required. He does not say plaintiff ever paid him, or promised to pay him anything for his services. It appears from Poling's own testimony that all conversations he had, concerning the manner of taking the options, were had with defendant, and those taken by him were turned over to defendant. They did not include Poling's own land, which lay within the coal field defendant was trying to get control of, and a letter written to him by defendant, on July 2, 1905, we think, has a very significant bear-

ing on plaintiff's contention that Poling was acting as his agent. In that letter defendant writes:

"In going over the options you left with me I notice you omitted the one for yourself and your father's land. Now, if you do not care to turn in this option it will be unnecessary for me to go any further in the matter and I shall drop it right where it is. If on the contrary you want me to go on and dispose of this property I must have your option, as I cannot safely dispose of something which I do not have. I want to hear from you in regard to this matter and you will please forward the option to me. Write me how the well is getting along."

Witness replied on July 8th, and the most of the contents of his letter relates to the oil wells. But he says, in regard to the options: "If I get to come home the 11 day I will take the option business then." This correspondence proves that defendant was dealing on his own judgment and responsibility, and that Poling knew it. When he was asked this direct question, "Were you to receive anything out of the profits that were made for taking these options?" Poling answered, "as well as I remember I probably maybe was to pay me for my time or something to that amount." He does not say who was to pay him. The few options which he took were for short duration, and expired. Those under which defendant acquired control of the land were not taken until in the fall of 1905, and were taken in defendant's own name. W. T. George and C. F. Teter were then associated with him in the venture. Witness Alman Poling gave defendant an option on his lands in November 1905, a thing very unlikely if he was plaintiff's agent. But he does not say he was acting as his agent. Plaintiff only says so.

When the time came to have the lands surveyed, defendant employed F. L. O'Neal to survey them and make maps, and agreed to pay him $1.00 per acre for his services, provided he made a sale of the land. This employment was at defendant's instance and wholly on his own responsibility, no mention was made of plaintiff. F. L. O'Neal does say he understood plaintiff and defendant were jointly interested, but he does not pretend to have gotten his information from defendant. He

says he heard plaintiff read the contract, but does not state
when it was: He admits he did the surveying for defendant,
and rendered his bill for services, not to Moore and O'Neal
jointly, but to Moore alone; and settled with Moore for one-
half the amount of his bill, after the land had been sold, on
the ground, he says, that Moore claimed he had made no
profits.

Another circumstance tending to disprove the alleged part-
nership is, that plaintiff and his wife gave defendant an op-
tion on a tract of 300 acres of land, situate on the opposite
side of the river, and near to the South Philippi coal field.
One of the inducements recited in the option is, that S. A.
Moore believes he can furnish ''a purchaser for the said coal.''
This shows the purpose of the option was to enable Moore
to make sale, and not that he was expected to become the pur-
chaser. It is not probable plaintiff would have given de-
fendant such option, if the alleged partnership had really ex-
isted between them. If they had been partners, it is but
natural and reasonable that O'Neal would have made pro-
vision for a share of the profits of the sale of that land also.

More significant, however, than any of the circumstances
we have yet mentioned, is the fact, that pending the taking
of the options and the sale of the land by defendant, there
was no consultation or communication of any kind between the
parties. Nothing was ever said concerning the price to be
paid the landowners, the amount of money necessary to be
advanced to secure the options, how it was to be provided, the
length of time the options should run, or the price to be paid
for surveying the lands. In fact, there is no evidence of any
such dealings as are usual between persons forming a part-
nership. Plaintiff admits that, for the most of the summer
of 1905, he was in Philippi, and occupied offices not more than
a hundred yards from defendant's office. True, he says he
was under contract to superintend the construction of the
piers of a bridge at Hinton, West Virginia, which required
his presence there most of the time during the latter part of
the summer and fall. But he was at home a number of times,
and says he would sometimes stay several days. Non-inter-

course between the parties strongly tends to prove non-existence of a partnership or joint undertaking.

Plaintiff's delay in instituting suit is another potent circumstance tending to support defendant's theory. As an excuse for his delay, he says he placed implicit confidence in defendant, who deceived him by telling him, shortly after the sale was made, that he had made no profit, but had simply traded dollars. Respecting his alleged confidence in defendant, plaintiff is contradicted by his own witness, Alman Poling, who swears he had a conversation with plaintiff, shortly after the land was sold, and says plaintiff then told him that he had learned defendant had made good profits out of the sale and he did not believe he was going to "treat him right in the deal." Moreover, plaintiff admits he knew of the conveyances from the landowners to defendant the latter part of 1905 or early in 1906. Those deeds were recorded shortly after they were made, as was also the deed from Moore to C. F. Reed, Guffey's trustee. All the deeds set out in full the consideration, paid and to be paid for the land, and were open to defendant's inspection. He says he first learned from Charles F. Teter, in 1912, that defendant had made large profits. But it is evident he did not rely altogether upon that information, for he says he examined the records shortly thereafter. Copies of all the deeds from the landowners to Moore, and also of the deed from Moore to C. F. Reed, trustee, are exhibited with the bill, showing clearly where he obtained the information on which he relies to prove profits. That source of information existed, and was open to him, from early in 1906. He was a civil engineer and surveyor of lands, and at one time was the county surveyor of Barbour county, and admits he frequently examined records in the clerk's office. He knew where the information could be gotten, and common prudence and reasonable diligence required that he should have examined the deeds. *Plant* v. *Humphries,* 66 W. Va. 88. He did not bring his suit until the 10th of April, 1913, although during all the years, from early in 1906, he lived in Philippi, and occupied an office hard by the courthouse. He did not demand of defendant a

settlement, until in December 1912, after defendant had moved from Philippi to the city of Charleston.

"One who would repel the imputation of laches by showing ignorance of his rights must be without fault in remaining in ignorance of those rights. Indolent ignorance and indifference will no more avail to prevent the bar of laches than will voluntary ignorance. Equity aids only the vigilant." *Plant* v. *Humphries, supra.* It does not appear that plaintiff made any effort whatever to discover whether defendant had made a profitable sale for six or seven years after he knew of the sale. In view of the circumstances of this case, plaintiff's long delay amounts to laches, showing abandonment of his right, if he ever had any in the premises. Laches has been defined to be: "Such delay in the enforcement of one's right as works a disadvantage to another; or, such delay, without regard to the effect it may have upon another, as will warrant the presumption that the party has waived his right." *Snyder* v. *Bridge Co.*, 65 W. Va. 1. See also *White* v. *Bailey*, 65 W .Va. 573.

Our conclusions lead to a reversal of the decree and dismissal of plaintiff's suit, and it will be so ordered.

*Reversed and suit dismissed.*