C. M. BALLARD

*v.*

T. S. KITCHEN *et al.*

(No. 9715)

Submitted October 2, 1945. Decided November 27, 1945.

*Maxwell W. Flesher*, for appellant.
*Marcum & Gibson*, for appellees.

Fox, JUDGE:

By suit in equity in the Circuit Court of Cabell

County, C. M. Ballard sought an injunction against T. S. Kitchen, Gilba Kitchen and Daisy Kitchen, to restrain them from operating a printing business on a lot adjoining the residence lot of plaintiff in Belford Extension to the City of Huntington. The printing plant, the operation of which was sought to be enjoined, was conducted by Gilba Kitchen and his wife, Daisy Kitchen. Gilba Kitchen is the son of T. S. Kitchen. The circuit court, by a decree entered on December 9, 1944, denied the relief sought, and Ballard prosecutes this appeal.

The Belford Extension to the City of Huntington was laid out in 1916, by F. F. Starcher and others, as a residence district. T. S. Kitchen acquired title to Lot No. 8 in Block 18 of said extension on July 16, 1920. Whether Kitchen erected the residence thereon does not appear from the record, but he had resided there continuously from 1921 to the date of the institution of this suit. The plaintiff Ballard in the year 1923 acquired title to Lot No. 7 in Block 18, and erected a residence thereon in 1924. Plaintiff's Lot No. 7 and the Kitchen Lot No. 8 adjoin and front on Eleventh Avenue. In the deeds by which Kitchen and Ballard acquired title to their respective lots there are identical covenants which appear to be common to all deeds by which lots were initially conveyed out of said extension. The pertinent parts of said covenants read as follows:

"The said parties of the second part for themselves and for their heirs, grantees and assigns, do hereby expressly covenant with the parties of the first part, their several grantees and assigns as a part of the consideration for the conveyance of the property described above, as follows: That no foundation shall be laid or building be erected upon said lot nearer than thirty (30) feet from the adjoining line of Eleventh Avenue except that a porch or other projection from any such building may extend into said restricted area of thirty (30) feet for such distance and in such manner as not to make unreasonable interference with other buildings erected in the said Belford Extension, and subject to a similar restric-

tion; that no main building the outer walls of which shall be of material other than brick, concrete or other fireproof material shall be erected upon said lot; that no main building costing less than Three Thousand ($3,000.00) Dollars when completed shall be erected upon said lot; that there shall not be erected upon said lot any building other than for dwelling or residential purposes or purposes of like nature, together with the necessary and proper out buildings appurtenant thereto, that there shall be not more than one dwelling; * * *."

Gilba and Daisy Kitchen, together with T. S. Kitchen, moved to the residence on Lot No. 8 in the year 1921. At that time Gilba Kitchen owned certain printing equipment, consisting of a small electrically operated, hand-fed press, type cases and probably other printing tools and appliances. This equipment was first placed in the attic of the Kitchen residence, where it remained until about 1922, when T. S. Kitchen built a double garage on the rear of his lot and the printing equipment was moved thereto. It does not appear that T. S. Kitchen at any time had any interest in the printing plant, but it is apparent that he consented to its operation. Gilba Kitchen, and probably his wife, operated this plant in a small way from 1921 to 1929, when they moved from Huntington to Louisville, Kentucky. Gilba Kitchen, prior to his removal to Louisville, was regularly employed by certain Huntington newspaper publishers, and his operation of the printing plant on the home premises seems to have been of secondary importance. Plaintiff knew of the operation of this plant and occasionally purchased printed matter and supplies from the Kitchens. In 1925 or 1926 Gilba Kitchen purchased a larger press, electrically driven, but hand-fed, placed the same in the garage, and used it in his printing business. After 1929, and until the year 1937, during which interim Gilba Kitchen and his wife lived in Louisville, the printing plant remained in the garage, and was occasionally operated by other members of the Kitchen family.

In 1937, Gilba Kitchen and his wife returned to Huntington, resumed their residence with T. S. Kitchen, and after their return devoted full time to the operation of the printing business in the garage on the Kitchen lot. About 1938 an addition to the garage was erected, which they used as an office in the transaction of their printing business. In May, 1940, Gilba A. Kitchen, Sr., who is probably the same person hereinabove referred to as Gilba Kitchen, and Gilba Kitchen, Jr., filed in the office of the Clerk of the County Court of Cabell County a certificate showing that they were engaged in the printing business under the assumed name of "The Franklin Printing Company", located at 311 West Eleventh Avenue in Huntington, West Virginia; and on February 5, 1942, Gilba A. Kitchen and Daisy B. Kitchen filed a like certificate describing a business bearing the same name and located at the same address. The address stated in both certificates was that of the Kitchen home, aforesaid. It is clear that the printing plant was operated continuously from 1937 on, and from May, 1940, the Kitchens, or some of them operated the plant in said garage and engaged in the printing business on a commercial basis. Some time late in 1940, the Kitchens purchased what is termed a "Clugie" press, which, as averred in · defendants' answer, cost three thousand dollars. About six months later, they purchased a linotype machine and some incidental equipment. These facts with respect to the growth of this printing business are stated to show that the extent and magnitude of the business changed after the return of the Kitchens from Louisville in 1937.

In this situation plaintiff instituted this suit in August, 1943. It is based upon the alleged violation of the restrictive covenant quoted above. A stipulation filed in the case furnishes proof of the greater part of the allegations of the bill especially as to the titles to the lots, and the covenant involved, but there was some dispute as to other pertinent facts. Plaintiff, averring his rights under the restrictive covenant aforesaid, makes this

further allegation: "* * * this plaintiff therefore further avers that in addition to being a violation to the restrictive covenants as hereinbefore set forth that because of the annoyance and noise, that the operation of said business constitutes a private nuisance in violation of his right as owner, occupant and resident of said property." In order to dispose of this allegation, we think it proper to say at the outset that, in our opinion, the proof does not sustain the allegation that the printing plant constitutes a private nuisance. The plaintiff's evidence, adduced on this issue, is not convincing, and the evidence as a whole being in conflict on highly important points, we are of the opinion that, on this issue, the plaintiff has not sustained the burden of proof resting upon him.

There was a demurrer to plaintiff's bill based on grounds specified as follows: That the restrictive covenant did not forbid or prohibit the operation of a business in the residence property located upon said lots or either of them; that the covenant only made the restriction that there should not be erected thereon any building other than for dwelling and residential purposes; and, that because the law requires covenants of this character to be strictly construed, it should not be held that the conduct of the printing business involved herein was inhibited by the restrictive covenant aforesaid. The demurrer was properly overruled and the grounds assigned in support thereof are expressly abandoned by defendants in their brief filed in this Court. The defendants also filed a joint answer in which they relied upon the points set up as grounds in support of their demurrer; and the further point that the plaintiff, over a long period of years, and without protest, having observed the defendants in the establishment of their printing business, and the extension and growth thereof, involving the expenditure of substantial sums of money, and having acquiesced in the operation of said printing business during such period, should be held to have waived any right which he might

previously have had to object to its continuance, and that he is now barred from objecting thereto. The answer also alleges violation of the restrictive covenant by the plaintiff as follows: that he had erected a building on his lot in violation of that provision of the covenant which prohibited the front main foundation wall thereof from being located closer than thirty feet from the line of Eleventh Avenue, except that the porch or other projection from any such building might extend into the reserved area in such manner as not to make unreasonable interference with buildings erected in said extension; and that no main building, the outer walls of which are not of brick, concrete or other fireproof material should be erected upon said lot.

We can see nothing unreasonable in the restrictive covenant quoted above, and it does not infringe upon any public policy. In such a situation this Court has many times upheld covenants of a similar nature, and, generally speaking, it is settled law that such covenants will be upheld and enforced. *Robinson* v. *Edgell*, 57 W. Va. 157, 49 S.E. 1027; *Withers* v. *Ward*, 86 W. Va. 558, 104 S.E. 96; *Cole* v. *Seamonds*, 87 W. Va. 19, 104 S.E. 747; *Kaminsky* v. *Barr*, 106 W. Va. 201, 145 S.E. 267; *Prindle* v. *Baker*, 116 W. Va. 48, 178 S.E. 513; *Wolfe* v. *Landers*, 124 W.Va. 290, 20 S. E. 2d 124. But the unrestricted use of property by the owner being favored in law, such covenants are strictly construed. *Deutsch* v. *Mortgage Securities Co.*, 96 W. Va. 676, 123 S.E. 793; *Neekamp* v. *Huntington Chamber of Commerce*, 99 W. Va. 388, 129 S.E. 314; *Moore* v. *Stevens*, 90 Fla. 879, 106 So. 901, 43 A.L.R. 1127; 14 Am. Jur. 621, Section 212.

We think it clear that, in maintaining and operating a printing plant on the Kitchen lot, the defendants have violated the covenant aforesaid, and that any defense they may have in this suit must have as its basis the acts and conduct of the plaintiff in connection with the violation of the said covenant.

A party may be barred from enforcing such restriction where, through *laches* or acquiescence for an unreasonable period, it would be inequitable to enforce the same, and in such circumstances the defense of equitable estoppel may be relied upon by a defendant who, through such *laches* or acquiescence, has been misled to his prejudice. *Stewart* v. *Finkelstone*, 206 Mass. 28, 92 N.E. 37; 2 High on Injunctions, 4th Ed. 1144, Section 1159; 14 Am. Jur. 644, Section 295; 26 C.J.S. 563, Section 169.

Another rule governing cases of restrictive covenants is that one's acquiescence in a minor violation thereof will not bar him from later insisting upon the covenant being complied with, when the subsequent violation becomes consequential as affecting his use of his property. *Kaminsky* v. *Barr, supra; Stewart* v. *Finkelstone, supra; Johnson* v. *Robertson*, 156 Iowa 64, 135 N. W. 585, 36 A. & E. Anno. Cas. 137; 14 Am. Jur. 644, Sections 296-7; 26 C.J.S. 564, Section 169.

In the case at bar the court below denied relief to plaintiff on the ground that plaintiff had been guilty of a violation of the restrictive covenant under which he sought relief, in that he had violated the provision of the covenant with respect to the location of his residence, and the alleged use of non-fireproof material in the construction thereof in the year 1924. We do not think the record furnishes a sufficient basis for granting relief on that ground. As stated above, plaintiff is clearly entitled to have the covenant enforced unless, through some conduct of his own, enforcement would be inequitable. It may be that the manner in which plaintiff erected the building on his lot constitutes a violation of the covenant, in that the projecting parts of his building in the front and rear, and possibly the two gables of his house, were not, in all their parts, wholly of fireproof materials. The testimony on this point is conflicting, and, having in mind the rule that restrictive covenants are to be strictly construed, we do not think the evidence would justify us in holding that the covenant was violated in this respect.

The rule of strict construction should be applied to the evidence on that point.

Although there may be some authority to the contrary, we are of the opinion that one who violates a covenant in one particular, cannot be heard to complain that another has violated the same covenant in another particular, where the covenant as a whole seeks a common purpose, as is the case before us. We think the defendants failed in their proof on this issue. Furthermore, even if the plaintiff did violate the covenant in the particulars attempted to be established, the Kitchens, at the date of the construction of the plaintiff's residence, lived on the adjoining lot, and made no protest; the rule they seek to apply to their own advantage should, we think, be applied to them in their attempt to show a violation of the covenant by the plaintiff.

We think the decree of the lower court should be sustained on the theory that it would be inequitable to enforce the said covenant as against the Kitchens at this late day. There are many reasons for this view. First, we think the plaintiff has been guilty of *laches*. From what we can observe from this record, it should have become apparent to the plaintiff as early as 1937, if not before, that Gilba and Daisy Kitchen intended to operate a printing plant in the garage on the rear of the Kitchen lot. Generally, *laches* applies to an unreasonable delay in asserting a known right; and in that sense the time element is usually considered to be of importance; but not always so. *Laches* has been defined as "such neglect or omission to do what one should do as warrants the presumption that he has abandoned his claim, and declines to assert his right." 6 Michie Va. and W. Va. Digest, 602. Another definition is: *"Laches* is inexcusable delay in asserting a right, and is an equitable defense, controlled by equitable considerations. To be a bar, the lapse of time must be so great, and the relation of the defendant to the right such that it would be inequitable to permit the plaintiff to assert it, where he has had, for a considerable period, knowledge of the existence, or

might have acquainted himself with it, by the use of reasonable diligence." *Cresap* v. *Cresap*, 54 W. Va. 581, 46 S.E. 582; see *Snyder* v. *Bridge Co*, 65 W. Va. 1, 63 S.E. 616; *Mitchell* v. *Cornell*, 88 W. Va. 194, 106 S.E. 866; *Allen* v. *LaFollette*, 94 W. Va. 700, 120 S.E. 176; *O'Neal* v. *Moore*, 78 W. Va. 296, 88 S.E. 1044. Here the plaintiff knowing in 1937, if not before, that the defendants meant to conduct the commercial printing business of which he now complains, made no protest at that time, and thereafter, over a period of six years, in which he had full knowledge of the facts, saw them making large expenditures of money in equipping the plant with an expensive press, linotype and other equipment, and devoting time and labor in expanding the business, but he did not protest. Then he instituted this suit. Time alone is not controlling in applying the doctrine of *laches*. Where the remedy is entirely equitable, and particularly as in this case, an injunction might have the effect of destroying what is termed in plaintiff's bill as a flourishing business, *laches* may be a valid defense notwithstanding there was not involved a long period of time. It was the duty of the plaintiff to protest when he first learned that the defendants were violating the restrictive covenant, and particularly so in the circumstances here shown to have existed.

Then there is the fact, noted above, that for a period of more than twenty years the plaintiff acquiesced in what we believe was a violation of the restrictive covenant. Plaintiff knew that the Kitchens were engaged in operating a printing plant early in the nineteen-twenties. He knew that because, during that period, he purchased supplies from them, and had them do printing for him, or for persons with whom he was associated. In 1925 or 1926, he must have observed, with no protest, that a new press was being installed in the garage on the Kitchen lot, and it is clear, therefore, that his acquiescence in the carrying on of this printing business by the defendants extended over a long period of time. It may be said that, in the beginning, this was a minor in-

fringement of the covenant, and that he had the right to overlook it, and still to complain later when it became of such importance as to seriously affect the value of his own property, and that of his neighbors in the Belford Extension, or their peace and comfort. We think he might well claim this; but such contention does not answer the further fact that after 1937, when the printing establishment first became a commercial business, he continued in his acquiescence and, without protest, permitted the Kitchens to purchase and install printing equipment costing substantial sums of money. Nor does the expenditure of money complete the picture. There was labor performed, and also the worries and vicissitudes of fortune, and the risks involved in building up the business.

Then there is the theory that acquiescence of the nature and to the extent disclosed by the record suggests the application of the principle of equitable estoppel. In *Spradling* v. *Spradling*, 118 W. Va. 308, 190 S.E. 537, we held: "In the absence of fraud or intentional wrong on the part of the person to be estopped, resulting in a detriment to one asserting estoppel, there can be no estoppel *in pais*." But that holding does not preclude the application of the principle of estoppel to this case, because in *Norfolk and W. R. Co.* v. *Perdue*, 40 W. Va. 442, 21 S.E. 755, it was held: "A party who by his acts, declarations, or admissions, or by failure to act or speak under circumstances when he should do so, either designedly or with willful disregard of the interests of others, induces or misleads another to conduct or dealings which he would not have entered upon but for this misleading influence, will not be allowed afterwards to come in and assert his right to the detriment of the person so misled. That would be a fraud." In 4 Michie Va. and W. Va. Digest, 211, the rule is stated as follows, and numerous authorities cited to sustain it: "The general rule of equitable estoppel, or, as it is frequently called, estoppel *in pais*, is that when one person, by his statements, conduct, action, behavior, con-

cealment or even silence, has induced another, who has a right to rely upon those statements, etc., and who does rely upon them in good faith, to believe in the existence of the state of facts with which they are compatible, and act upon that belief, the former will not be allowed to assert, as against the latter, the existence of a different state of facts from that indicated by his statement or conduct, if the latter had so far changed his position that he would be injured thereby." It is unnecessary to quote authorities on the proposition that one who with knowledge of his rights, permits another to engage in a certain course of action, or to make expenditures, may not thereafter act contrary to his conduct in failing to assert his rights, or make protest, when such failure misled the other party to his prejudice; such failure is a fraud upon one who, in the light of such conduct, pursues a course of action which cannot be retraced without prejudice to himself. In 3 Pomeroy's Equity Jurisprudence, 5th Ed. 184, Section 803, there is this statement: "There is a theory which makes the essence of equitable estoppel to consist of fraud. In accordance with this view, the language used by some courts in defining and describing the general doctrine has been so sweeping and positive that, taken literally, it does not admit the possibility of such an estoppel unless the party has been guilty of actual intentional fraud in law; and thus the whole doctrine is represented as virtually a mere instance of legal fraud. This theory is not sustained by principle, and it cannot be made universal. There are well-settled cases of equitable estoppel, familiar to courts of equity, which do not rest upon fraud, and instances are admitted even by the courts which maintain this theory, which cannot be said to involve any element of fraud unless by a complete perversion and misuse of language. It is undoubtedly in accordance with the methods long pursued by courts of equity to apply the term 'fraudulent' to the party estopped, in the following manner: It is in strict agreement with equitable notions to say of such party that his repudiation of his own prior conduct which had amounted to

an estoppel, and his assertion of claims notwithstanding his former acts or words, would be *fraudulent*, —would be a *fraud* upon the rights of the person benefited by the estoppel. It is accurate, therefore, to describe equitable estoppel, in general terms, as such conduct by a party that it would be fraudulent, or a fraud upon the rights of another, for him afterwards to repudiate and to set up claims inconsistent with it. This use of the term has long been familiar to courts of equity, which have always treated the word 'fraud' in a very elastic manner. The meaning here given to fraud or fraudulent is virtually synonymous with 'unconscientious' or 'inequitable' ". See also Section 805, 3 Pomeroy's Equity Jurisprudence. The facts stated above with respect to *laches* and acquiescence may be considered in determining whether the doctrine of equitable estoppel can be applied thereto. We do not consider it important whether we deny plaintiff relief on the grounds of *laches* or estoppel. Suffice it to say that, in our opinion, either is sufficient to bar relief. Unless we throw aside all principles of equity which require equitable conduct on the part of one who possesses any character of right, and that he must assert such right on occasions when failure to do so would mislead others to their prejudice, we cannot grant reief in a case where plaintiff stood by, permitted his rights to be violated by another, but so conducted himself as to lead that other person to believe that he has waived or abandoned his right to protest. This is particularly true where, as in this case, the conduct of the plaintiff must have misled the defendants, as evidenced by the expenditure by them of large sums of money, which, we may conclude, would not have been expended but for such acquiescence, and failure to protest. Clearly, it was the duty of plaintiff to protest against the operation of this printing plant when the Kitchens returned to Huntington in 1937, and began to devote their entire time to this business. Having failed so to do, he cannot now be heard to complain.

There is another principle which, in our opinion, may

be applied to this case, and which supports our general view that it would be inequitable to grant to plaintiff the relief he seeks. The evidence does not establish the existence of a private nuisance. Considering the testimony on that point, and dealing with it practically, we doubt whether there is any substantial annoyance, in the physical sense, arising from the operation of the printing plant. The advantages accruing to plaintiff in having it removed would be slight, as compared to the injury which would result to the Kitchens in having to dismantle the plant and go elsewhere, no doubt at large expense, and set up a new establishment. We do not mean to say that a person who violates another's right should be permitted to justify his conduct on the theory that a correction of his actions should not be enforced merely because the gain thereby accorded the injured party would be disproportionate to the loss of the wrong-doer. But in the circumstances of this case, when we consider the loss to the defendants, with the *laches* and acquiescence of the plaintiff, we think the doctrine of balancing of equities can be reasonably applied, and we would deny plaintiff relief on that ground.

On the whole, we are of the opinion that the defendants have violated the restrictive covenant here involved; that had the plaintiff made timely protest when he first learned of such violation, and, within a reasonable time, acted thereon, he would have been entitled to the relief prayed for; but we are further of the opinion, that the plaintiff, by his failure to so protest, and through his acquiescence and delay in asserting his rights, misled the defendants to their prejudice, to such an extent that it would now be inequitable to grant the relief prayed for.

The decree of the Circuit Court of Cabell County is, therefore, affirmed.

*Affirmed.*